## IN THE UNITED STATES DISTRICT COURT
### FOR THE DISTRICT OF NEW MEXICO

DARYL M. HEISKELL,

        Plaintiff,

v.                                         No. CIV 04-860 LFG

JOANNE B. BARNHART,
COMMISSIONER OF SOCIAL SECURITY,

        Defendant.

### MEMORANDUM OPINION AND ORDER

Plaintiff Daryl M. Heiskell ("Heiskell") invokes this Court's jurisdiction under 42 U.S.C. § 405(g), seeking judicial review of a final decision of the Commissioner of Social Security ("Commissioner"). The Commissioner determined that Heiskell was not eligible for disability insurance benefits ("DIB"). Heiskell moves this Court for an order reversing the Commissioner's final decision and/or remanding for a rehearing. [Doc. No. 11.]

### Background

Heiskell was born on May 7, 1944. He has a high school education and about two years of college. He served in the military from 1965-1968. [Tr. at 27, 79, 61.] Heiskell worked as a construction project manager and superintendent from about 1975 – 2000, until he suffered a heart attack. [Tr. at 27.] On May 17, 2001, Heiskell filed a first application for DIB that was denied and not appealed. [Tr. at 22, 34, 61.] In February 2002, he filed the present application for DIB, alleging disability based on coronary artery disease with an onset date of July 30, 2000. [Tr. at 21, 35, 64.]

Heiskell was 56 years old on the date of onset of his alleged disability.  The last day he worked was February 29, 2000.  [Tr. at 64.]

Presently, Heiskell lives alone in his "Fifth Wheel."  [Tr. at 392.]  He receives $807/month from the Veterans Administration ("VA") based on the VA's finding of disability.  [Tr. at 393.]

Administrative Law Judge ("ALJ") Gerald Cole held an administrative hearing on May 29, 2003, at which Heiskell appeared with his cousin.  Heiskell was not represented by legal counsel, although the ALJ discussed with him his right to representation.  [Tr. at 388.]  In a decision, dated October 1, 2003, Judge Cole found that Heiskell was not eligible for benefits.  [Tr. at 18.]  On July 19, 2004, the Appeals Council denied Heiskell's request for review.  [Tr. at 7.]  This appeal followed.

## Standards for Determining Disability

In determining disability, the Commissioner applies a five-step sequential evaluation process.[1] The burden rests upon the claimant to prove disability throughout the first four steps of this process, and if the claimant is successful in sustaining his burden at each step, the burden then shifts to the Commissioner at step five.  If, at any step in the process, the Commissioner determines that the claimant is or is not disabled, the evaluation ends.[2]

Briefly, the steps are: at step one, claimant must prove he is not currently engaged in substantial gainful activity;[3] at step two, the claimant must prove his impairment is "severe" in that it "significantly limits his physical or mental ability to do basic work activities . . . .,"[4] at step three,

_____

[1]20 C.F.R. § 404.1520(a)-(f) (1999); Williams v. Bowen, 844 F.2d 748, 750 (10th Cir. 1988).

[2]20 C.F.R. § 404.1520(a)-(f) (1999); Sorenson v. Bowen, 888 F.2d 706, 710 (10th Cir. 1989).

[3]20 C.F.R. § 404.1520(b) (1999).

[4]20 C.F.R. § 404.1520(c) (1999).

2

the Commissioner must conclude the claimant is disabled if he proves that these impairments meet or are medically equivalent to one of the impairments listed at 20 C.F.R. Part 404, Subpart P, App. 1 (1999);[5] and, at step four, the claimant bears the burden of proving he is incapable of meeting the physical and mental demands of his past relevant work.[6]  If the claimant is successful at all four of the preceding steps, the burden shifts to the Commissioner to prove, at step five, that considering claimant's RFC,[7] age, education and past work experience, he is capable of performing other work.[8] If the Commissioner proves other work exists which the claimant can perform, the claimant is given the chance to prove he cannot, in fact, perform that work.[9]

## Standard of Review and Allegations of Error

On appeal, the Court considers whether the Commissioner's final decision is supported by substantial evidence, and whether the Commissioner used the correct legal standards.  Glenn v. Shalala, 21 F.3d 983, 984 (10th Cir. 1994).  To be substantial, evidence must be relevant and sufficient for a reasonable mind to accept it as adequate to support a conclusion; it must be more than a mere scintilla, but it need not be a preponderance.  Trimiar v. Sullivan, 966 F.2d 1326, 1329 (10th Cir. 1992);  Muse v. Sullivan, 925 F.2d 785, 789 (5th Cir. 1991).  The Court's review of the Commissioner's determination is limited.  Hamilton v. Secretary of Health & Human Servs., 961 F.2d

---

[5]20 C.F.R. § 404.1520(d) (1999).  If a claimant's impairment meets certain criteria, that means his impairment is "severe enough to prevent him from doing any gainful activity."  20 C.F.R. § 416.925 (1999).

[6]20 C.F.R. § 404.1520(e) (1999).

[7]One's RFC is "what you can still do despite your limitations."  20 C.F.R. § 404.1545(a).  The Commissioner has established RFC categories based on the physical demands of various types of jobs in the national economy.  Those categories are: sedentary, light, medium, heavy and very heavy.  20 C.F.R. § 405.1567 (1999).

[8]20 C.F.R. § 404.1520(f) (1999).

[9]Muse v. Sullivan, 925 F.2d 785, 789 (5th Cir. 1991).

3

1495, 1497 (10th Cir. 1992).  The Court's function is to determine whether the record as a whole

contains substantial evidence to support the Commissioner's decision and whether the correct legal

standards were applied.  Id. at 1497-98.  In Clifton v. Chater, the Tenth Circuit described, for

purposes of judicial review, what the record should show:

> The record must demonstrate that the ALJ considered all of the
> evidence, but an ALJ is not required to discuss every piece of
> evidence.  Rather, in addition to discussing the evidence supporting
> his decision, the ALJ must discuss the uncontroverted evidence he
> chooses not to rely upon, as well as the significantly probative
> evidence he rejects.

Clifton v. Chater, 79 F.3d 1007, 1009-1010 (10th Cir. 1996) (internal citations omitted).  If

supported by substantial evidence, the decision of the Commissioner is conclusive and must be

affirmed.  The Court cannot re-weigh the evidence or substitute its judgment for that of the

Commissioner.  Hargis v. Sullivan, 945 F.2d 1482, 1486 (10th Cir. 1991).

After thoroughly reviewing Heiskell's numerous medical records, the ALJ concluded that

Heiskell was not disabled under the standards of the Social Security Act ("SSA").  [Tr. at 21-29.]

In reaching his decision, Judge Cole made the following findings: (1) Heiskell did not engage in

substantial gainful activity since the onset of disability; (2) Heiskell is limited in his ability to perform

basic work activities by coronary artery disease, "status post five-vessel coronary artery bypass

grafting in January 2002"; obesity; and an unstable sternum, associated with a broken fracture wire;

(3) his impairments are severe; (4) Heiskell's allegations concerning his ability to work are "only

partially credible"; (5) from the alleged onset date of July 30, 2000 (date near Heiskell's first heart

attack and surgery) to December 15, 2001, Heiskell had the residual functional capacity (RFC) for

at least light work, including the capacity for a full range of sedentary work; (6) from December 15,

2001 to August 12, 2002, Heiskell was unable to perform any sustained work activity on a regular

4

and continuing basis, but since August 12, 2002 and continuing through the date of the ALJ's decision, Heiskell has had the RFC for a full range of sedentary work and a more limited range of light work; (7) Heiskell has been unable to perform his past relevant work; (8) he is considered a person of "advanced" age throughout the period under review; (9) he has a high school education and some college education; (10) Heiskell has highly marketable work skills from his prior work which are "readily transferable" to the skill requirements of skilled work within his current RFC; and, (11) except for a period of less than 12 months during the pertinent time frame, Heiskell has been able to perform light and sedentary jobs that exist in significant numbers in the national economy. [Tr. at 28.] In sum, the ALJ concluded that Heiskell was not under a disability, as defined by the SSA, from his alleged onset date of July 30, 2000. [Tr. at 28.]

In this appeal, Heiskell generally argues that reversal and remand are required because the "[t]he ALJ made three reversible errors in denying [his] claims for disability benefits, and several other errors as well." [Doc. No. 12, p. 3.] Specifically, Heiskell contends that the ALJ's RFC finding was vague, conclusory and unsupported by evidence, and that as a result, these errors tainted the VE's testimony. Heiskell asserts that Judge Cole did not explain the relationship between the VE's testimony and the ultimate findings regarding disability, including a failure to explain that Heiskell's inability to perform a full range of light work reduced the number of light occupations he could do. The ALJ did not ask the VE to explain inconsistencies in her opinion, and the ALJ did not support his finding that Heiskell's skills were "highly marketable." Lastly, Heiskell argues that the ALJ did not acknowledge and address Heiskell's wish to hire an attorney and failed to adequately develop the record.

5

The Commissioner argues that the ALJ's determination was consistent with regulatory criteria. The ALJ applied the correct legal standards in finding that Heiskell was not disabled under the SSA and substantial evidence supported his decision. [Doc. No. 13, p. 16.]

## Summary of Heiskell's Medical Condition and Treatment

Heiskell's medical records begin in 2000 and end in late 2003. Heiskell's medical care was provided primarily by the Veteran's Administration medical facilities ("VA").

### *2000 Medical Records*

In February 2000, Heiskell complained of chest pressure and shortness of breath ("SOB") at the VA's emergency room. He stated he felt chest pressure when he "overdid it" The medical notes state that Heiskell was "not taking meds for several weeks - HTN [hypertension] is out of control." The record documented Heiskell's occurrence or history of MI ("myocardial infarction") (about 2 months earlier).[10] [Tr. at 196, 304.]

In late July 2000, Heiskell was seen at the Joplin, Missouri Freeman Hospitals. He complained of chest pain at the emergency room. The medical records indicate that Heiskell had no documented cardiac history and that Heiskell denied any prior problems with his heart. *But see* later medical record at Tr. 285 (hospitalized for chest pain in 1982). The onset of chest tightness occurred while Heiskell was fishing. The doctor concluded Heiskell would require cardiac catheterization because of unstable angina and elevated enzyme levels. [Tr. at 154, 162.] Apparently, Heiskell had suffered a heart attack. *See* Tr. at 300. On July 27, 2000, Dr. Zuehlke performed the cardiac

_____

[10]There is no medical record corresponding to this occurrence of an MI. Myocardial infarctions are also known as heart attacks.

catheterization, and Heiskell was released on July 27.  [Tr. at 159, 160, 164.]  Heiskell was to follow up in two weeks, but there are no records to indicate he did.

Heiskell indicated in his DIB applications that he was unable to work because of his disability since July 2000.  [Tr. at 23.]  In a Daily Activities Questionnaire, Heiskell wrote that he had not worked since February 2000.  [Tr. at 62, 64, 101.]

On September 29, 2000, Heiskell was seen by the VA.  His blood pressure was very high and "out of control."  Heiskell used chewing tobacco and stated that he was not interested in stopping his use of "snuff."  [Tr. at 296.]  On October 2, 2000, Heiskell visited the VA to establish a primary care physician ("PCP").  He reported chest discomfort and pressure for about a month.  The record notes that after Heiskell's July 2000 MI, his condition was to be managed with medications.  Heiskell stated that he initially felt all right after his July surgery, but felt increased chest pressure for a month since running out of his medications.  He had not taken any nitroglycerin ("nitro" or "NTG") for chest discomfort because it was "not that bad."  [Tr. at 300.]  Another medical record, dated October 2, 2000, notes that Heiskell had chest tightness upon exertion that had occurred recently on a hunting trip while carrying a deer he had shot and killed.  [Tr. at 309.]

Based on the chronology, Heiskell must have gone big game hunting within a month or two of his heart attack at the end of July 2000.  The October 2 medical record states that Heiskell did not take his medications on a regular basis because he had trouble affording them.  He was advised to stop his use of tobacco.  [Tr. at 309.]  A medical record, dated October 10, indicates that Heiskell's current health problems related to his tobacco use.  [Tr. at 176.]  An additional October 10th VA record notes Heiskell was seen in ER the prior week for angina and very high blood pressure, but that since his last visit Heiskell had had no further chest pain or pressure.  However, he was fatigued with

exertion and suffered mild dyspnea when splitting firewood or unloading heavy items from a truck. [Tr. at 312.] Heiskell also stated he had camped near Mt. Taylor the previous weekend and felt the high altitude was hard on him.  Another October 11, 2000 medical record notes that the medical care provider suspected "anginal pain likely related to poorly controlled HTN . . . ."  [Tr. at 310.]

On December 15, 2000, Heiskell had his initial PCP visit at the VA and requested that Dr. Dugan be his PCP, even though he was informed that Dr. Dugan would be leaving the VA in six months.[11]  [Tr. at 314, 316.]  Heiskell had been compliant with his blood pressure medications  but had not been taking the prescribed aspirin.  The record notes: "Only gets chest discomfort with heavy exertion (eg while pushing 300 lb tool box yesterday) that is relieved after 10 minutes of rest." Heiskell did not need to use the NTG.  He suffered from no chest pressure or pain while engaging in regular activities like walking and shopping.  Again, Heiskell was not interested in stopping his use of "snuff."  The doctor advised him to avoid heavy exertion and noted that Heiskell could "continue to work as construction manager but probably should avoid any heavy construction work."  [Tr. at 314.]  Thus, as of December 2000, the doctor did find that Heiskell was unable to work, contrary to Heiskell's assertions that he could not work after either February or July 2000.

### *2001 Medical Records*

On March 26, 2001, Heiskell was seen by Dr. Dugan at the VA for a follow-up visit.  He complained of fatigue that was worse with exertion.  He denied chest pain or SOB.  He had not needed to use the NTG.  He had run out of some of his medications because of difficulties with the prescription system.  However, Dr. Dugan noted that ample refills remained for Heiskell's medications and that Heiskell was not taking all of the prescribed medications.  Dr. Dugan found it

---

[11]It appears that Dr. Dugan first saw Heiskell later on March 26, 2001.  [Tr. at 184, 316, 317.]

difficult to know the effect of Heiskell's prescribed treatment since Heiskell was not taking all of the medications.  Dr. Dugan advised him to stop his use of "snuff."  [Tr. at 184.]

On March 26, 2001, Dr. Dugan wrote a letter "to whom it may concern" on behalf of Heiskell.  He stated that Heiskell was currently under his care for cardiac problems that began in July 2000.  Dr. Dugan indicated that they were "having some difficulties in finding the correct combination of medications for him."  Heiskell's cardiac function was not optimal and he was unable "as of yet" to return to his work as he previously performed it.  [Tr. at 166.]

On April 9, 2001, Heiskell's chest x-ray indicated no significant change since the x-ray results from October 2, 2000.  [Tr. at 188.]  An April 10, 2001 record shows that Heiskell was seen at the VA for follow-up regarding his blood pressure.  [Tr. at 181-84.]  It seems that Dr. Handanos saw Heiskell on that day.  The pharmacist first noted that Dr. Dugan decreased Heiskell's Atenolol prescription.  Heiskell complained of chest pain over the last 3 days and pressure in his left chest area. Heiskell had understood Dr. Dugan's previous instructions to mean he should stop his nitro patch and his cholesterol medications.  The pharmacist indicated she strongly agreed with Dr. Dugan's decision to try to simplify Heiskell's medication regimen because Heiskell clearly misunderstood the directions with his medications.  Heiskell was supposed to continue the NTG patch but instead, had stopped its use.  Heiskell did not appear to be in heart failure based on Dr. Handanos's examination and his chest x-ray.  His tobacco use was not addressed that day because his appointment already lasted 1.5 hours. [Tr. at 183.]

On May 7, 2001, Heiskell was again seen at the VA's pharmacy clinic.  He had no desire to stop using "snuff".  He complained that he experienced chest pain two times since the last visit but said it never lasted long enough to need the NTG.  "The 2 events occurred while driving after a long

9

day working." [Tr. at 179.]  It is not clear what the reference to work meant.  The frequency of Heiskell's angina had decreased dramatically since his last visit.  It was possible that the Atenolol was leading to his fatigue but in weighing risks against benefits, the health care provider opted to continue it.  The VA again encouraged cessation of tobacco use.  [Tr. at 179, 327.]

Ten days after this appointment, Heiskell filed his first DIB application, alleging disability due to coronary artery disease and a MI.  [Tr. at 34, 61.]  He claimed his heart disease prevented him from working and that he could not work because of lack of stamina.  [Tr. at 72.]  As of that date, Heiskell weighed 250 pounds.  The disability interviewer observed that Heiskell was obese and had trouble breathing.  [Tr. at 88.]

On June 19, 2001, the VA wrote to Heiskell indicating that a favorable decision had been made with respect to his VA disability application, but that details would be provided later.  [Tr. at 60.]  (The details were not provided until about a year later - Tr. at 379).

On June 25, 2001, Heiskell saw Dr. Dugan.  Heiskell stated: "Doctor, I just can't do shit after my heart attack."  [Tr. at 177.]  He complained of  fatigue with exertion, but denied chest and arm pain.  No NTG was needed.  He suffered from mild SOB with exertion.  Dr. Dugan observed that Heiskell was on at least two medications that were known to cause fatigue – Atenolol and Terazosin. Dr. Dugan decided to make a "radical change" in Heiskell's medications to see if it would improve his blood pressure control and symptoms.  With respect to Heiskell's obesity and deconditioning, Dr. Dugan offered him a referral to the cardiac rehabilitation program because Dr. Dugan thought Heiskell was an "ideal candidate for some supervised exercise and the occasional whipping, but he declined."  [Tr. at 178.]  Heiskell said he had to go to Oklahoma for legal reasons relating to his divorce and could not attend the program regularly.  He also told Dr. Dugan that he "plans to get

10

'plenty of exercise' this fall during the elk hunting season."  Dr. Dugan wrote "we'll see."  [Tr. at 178.]

Dr. Dugan also noted that the change in Heiskell's medications might precipitate angina but that he had "never been that impressed with his anginal symptoms anyway."  With respect to Heiskell's "legal problems," Dr. Dugan noted that Heiskell needed "documentation stating poor capacity to work at present.  His VA disability has recently been approved.  I will ask SW to look into exactly what kind of documentation is needed."  [Tr. at 178.]

On July 3, 2001, Heiskell was seen at the VA pharmacy clinic.  Heiskell's blood pressure was above his goal of 140/90.  He stated he did not want to stop using "snuff" but had reduced it by 50% since his last visit.  The pharmacist suggested Heiskell use snuff alternatives or products that had a lower nicotine content.  [Tr. at 331.]  Although Dr. Dugan signed off on the pharmacist's note, it does not appear that Dr. Dugan saw Heiskell on July 3rd.

On July 10, 2001, Dr. Dugan wrote a letter addressed to "to whom it may concern," on behalf of Heiskell.  Dr. Dugan stated that he had been Heiskell's doctor since October 2000, had seen him on five occasions,[12] and was thoroughly acquainted with his past medical history and current problems.  [Tr. at 167, 173.]  Heiskell had had ongoing problems with fatigue and poor exercise capacity since his MI in August 2000.  According to Dr. Dugan, Heiskell was "currently unable to work in former capacity."  That might change, however, as Heiskell's health improved.  Dr. Dugan stated that he was working closely with him.  [Tr. at 334.]

---

[12]Based on this Court's review of the VA medical records, it appears that Dr. Dugan had seen Heiskell during two appointments but has signed off on Heiskell's pharmacy records on other occasions.

On July 24, 2001, Heiskell was seen again at the VA.  By this date, Dr. Dugan apparently had left the VA.  Dr. Handanos signed off on the medical record.  Heiskell still complained of decreased energy but thought he was doing better overall even though he had not pushed himself much.  [Tr. at 172.]  He was taking all of his medications in the morning so he would not forget them.  He was not exercising other than normal walking.  His tobacco use had not changed. He seemed "mildly agreeable" to using snuff alternatives.  Heiskell was "well above" his blood pressure goal of 140/90. [Tr. at 173.]

On August 8, 2001, Heiskell filled out a daily activities questionnaire related to his first DIB application.  [Tr. at 98.]  He weighed 241 pounds then.  He stated he had been responsible for large construction projects for over 25 years but had not worked since February 2000.  [Tr. at 98, 101.] On the chest pain questionnaire, Heiskell stated that he suffered from chest pain deep inside that varied (only a month earlier, Tr. at 175, he reported no chest pain and no dizziness).  [Tr. at 102.] Heiskell did not take NTG.  He had not taken the treadmill test since his heart attack.

On September 21, 2001, Heiskell visited the VA to establish a new PCP.  [Tr. at 169.]  He complained of SOB since his heart attack in 2000.  He had chest pain episodes once a month since his MI in 2000, but they had not increased in severity or frequency.  He felt tingling in his arms and hands.  Heiskell rated his level of pain at a level 3 of 10.  He had not used sublingual nitro because he had not felt the need was severe enough.  This record indicates that Heiskell had a history of smoking but that he quit 25 years ago.  He currently "dips tobacco."  He drinks alcohol occasionally and was a heavy drinker in the past.  The doctor attempted to schedule a stress test for Heiskell as an outpatient.  However, Heiskell stated he was only able to perform that test between October 12 and October 25 "since he is often away on hunting trips."  [Tr. at 340.]  The doctor stressed the

importance of the test to Heiskell but Heiskell was "adamant about hunting" and stated he would not come in for the test if it did not accommodate his hunting plans. [Tr. at 340.]

On October 15, 2001, a physical RFC assessment was performed by a consultative physician for disability services. [Tr. at 201.] The primary diagnosis was coronary disease. The consulting doctor restricted Heiskell to 20 pounds of lifting occasionally, 10 pounds of lifting frequently, 6 hours of standing/walking, 6 hours of sitting, and unlimited restrictions on his ability to push and pull. The consulting physician noted Heiskell's hunting trips, and his pain upon exertion related to splitting firewood and unloading heavy items. [Tr. at 201.]

On October 18, 2001, Heiskell's first application for DIB was denied. [Tr. at 37.]

Presumably, Heiskell must have gone hunting as planned. He did not have his stress test performed. The next medical records are dated 2002 and begin in Las Vegas, Nevada where he later said he spent winters. [Tr. at 246.]

### *2002 Medical Records*

On January 1, 2002, Heiskell was admitted to the Las Vegas Valley Hospital. The records note congestive heart failure with chest pain, obesity, hypertensive heart disease, chronic obstructive pulmonary disease. A heart catheterization revealed severe coronary artery disease. Heiskell underwent a successful revascularization. [Tr. at 217.] On January 3, 2002, Dr. Berkley recorded that Heiskell had a "distant smoking history," that he continued "to chew," he was obese, sedentary and has hypertension. Heiskell had been noncompliant with medications off and on "due to proximity/arrangement to nearest medical facility." He had been off his medications at times. [Tr. at 213, 221.]

13

At the Las Vegas Valley Hospital, Heiskell underwent "coronary bypass times five." [Tr. at 209.] Heiskell was released on January 22, 2002.

On February 12, 2002, Dr. Cohler (of Cardiovascular and Thoracic Surgery in Las Vegas) wrote a letter to Dr. Berkley regarding Heiskell's follow-up visit after his coronary bypass surgery. Dr. Cohler reported that Heiskell was pleased with his progress and "able to walk and do most of the things he wishes to do." [Tr. at 227.] Heiskell denied chest pain or other major problems. [Tr. at 227.]

On February 21, 2002, nine days after this letter was written, Heiskell filed the present application for DIB benefits, alleging disabilities of coronary artery disease and hypertension. [Tr. at 35, 64.] In his Disability Report, Heiskell stated that he stopped work because of his heart attack (although it appears he continued to hunt and engage in some heavy exertion activities within one to two months after his July 2001 surgery). [Tr. at 108, 130.]

On February 13, 2002, Heiskell filled out a Daily Activities Questionnaire, in which he sated that he typically got up at 5:30 to 7 a.m., but had trouble sleeping. Heiskell did not need help with personal grooming. He was able to do the housework, laundry, vacuuming, dusting, washing and shopping. He spent all day on housework at times and performed household repairs. Heiskell stated he was unable to lift objects, but hunted and fished. [Tr. at 125-26.]

On February 27, 2002, Heiskell was seen at the VA clinic in Pahrump, Nevada. He was new to the clinic and wished to establish a PCP. The record indicates Heiskell was hospitalized in 1982 for chest pain. [Tr. at 285.] The doctor encouraged him to cease tobacco use and alcohol. Heiskell was advised to exercise regularly to reduce his weight. As of this date, Heiskell was exercising at least three times a week. [Tr. at 285.]

It seems that Heiskell also filed for disability benefits in the State of Nevada on April 3, 2002. [Tr. at 246.]  The disability case notes indicate that Heiskell alleged disability due to "5 bypass surgeries."  Heiskell was living in Pahrump, NV then and was being treated by the VA there.  He stated that he lived in Las Vegas during the winter, but had a home in New Mexico where he stayed the rest of the year.  Heiskell reported that he was going to be scheduled for stress testing but had asked New Mexico's VA to postpone the test until after the hunting season.  [Tr. at 246.]

There are no more medical records from Nevada.  On May 7, 2002, Heiskell was seen at the VA again in Albuquerque.  [Tr. at 266.]  The record indicates that he had had a "CABG" (Coronary Artery Bypass Surgery) on 1/8/02 while visiting in Nevada.  Heiskell had done "fairly well postoperatively."  His SOB was resolved.  Heiskell had some chest wall discomfort and stated that he knew "where every one of those wires is located."  He was not taking the aspirin but would restart it that day.  His blood pressure was fairly well controlled.  [Tr. at 266, 344.]

On May 17, 2002, Heiskell received a confirmation letter from the VA describing his benefits. [Tr. at 379.]  He was to receive payments beginning back on 1/1/01 and an additional sum on 12/1/01.  Heiskell was entitled to a non-service related pension (based on "hypertension with CAD and heart attack in 2000").  [Tr. at 379, 383.]  The letter stated that the VA rating decisions were enclosed, along with a detailed explanation of the decision and the evidence that supported the decision.  The explanation of benefits is very limited, and appears to be based on medical records between only October and December 2000.  [Tr. at 383.]

On June 12, 2002, a physical RFC assessment was again performed on Heiskell.  The restrictions were similar, if not the same, as noted in the prior assessment.  Heiskell could lift 20 pounds occasionally and 10 pounds frequently.  He could walk, stand and sit for up to 6 hours a day.

He was not limited in his abilities to push and pull.  A different consulting physician noted the instances when Heiskell engaged in heavy exertion related to hunting and other work, as well as his failure to follow through with the stress test because of hunting season.  The consulting physician concluded that Heiskell's "combination of obesity and CABGx5 ("bypass surgery") limits [him] to light work."  [Tr. at 234.]

On June 14, 2002, Heiskell's second application for DIB was denied.  On July 11, 2002, Heiskell had an appointment with the VA.  The record notes that he missed his appointment for a cardiolyte (exercise stress test).  The record also indicates that after Heiskell had an emergent CABGx5 on January 18, 2002 in Nevada, he had been doing well and had not complained of exertional chest pain or SOB.  Heiskell was not taking his daily aspirin and the VA emphasized the importance of doing so for a patient with cardiac artery disease.  The health care provider planned to encourage exercise for Heiskell at Heiskell's next visit.  They again encouraged Heiskell to stop using snuff.  This is the first medical record in which a doctor noted a problem with Heiskell's chest wires from the bypass.  There was "inferior sternal wire disruption."  [Tr. at 261, 346.]

Also on July 11, 2002, Heiskell filled out a Reconsideration Disability Report, in which he stated that his chest bone did not mend completely, creating problems in walking, exercising and sleeping.  He was unable to lift much or sleep.  He could not stand for more than two hours.  Any exercise he did created pain in his hip joints.  [Tr. at 141.]

On August 22, 2002, Heiskell was seen by Physician Assistant ("PA") Edward Elder in the CardioThoracic Department of the VA.  Heiskell was referred for chronic drainage from the left saphenous harvest site and for possible instability of his sternum.  [Tr. at 350.]  Since March 2002, Heiskell reported that he noticed movement in his distal sternum.  He was unable to sleep on his right

side and could not do anything forceful with his upper extremities.  The PA wrote that Heiskell had

instability of the distal sternum associated with a fractured wire.  Elder noted that removal of the wire

along would not be enough to control Heiskell's discomfort and he discussed surgery options with

Heiskell.  However, Heiskell wanted to participate in the hunting season and requested that any

intervention be postponed for one month.  [Tr. at 352.]

On August 22nd, Heiskell also saw Dr. Bibb, who is a resident physician at the VA.  Heiskell

denied any chest pain or SOB then.  He was feeling "much better."  Heiskell was to have a follow-up

visit regarding possible surgery related to the wire fracture.  [Tr. at 353-54.]

On September 4, 2002, Heiskell's request for reconsideration of the denial of his DIB

application was denied.

On December 17, 2002, Heiskell was seen by the VA again.  Over the past three months, he

reported grating of the bone with respirations that prevented him from exercising.  He continued to

gain weight and felt his sternum was inhibiting him from exercising.  He stated that he was "usually

active but [had] taken it easy for last several months due to movement/pain."  The assessment was

the same as it had been in August 2002.  In fact, the August and December medical records are very

similar.  [Tr. at 250.]

On December 18, 2002, Dr. Pett saw Heiskell at the VA.  His notes reflect that Heiskell's

distal sternum was unstable.  The broken wire from August 2002 was unchanged.  Dr. Pett told

Heiskell that he would not be able to stabilize the sternum without redoing the entire sternal closure.

He planned to do a CT of the thorax on March 13, 2003 with a follow-up visit on March 14, in order

to make a decision regarding surgery.  If Heiskell developed more discomfort or new broken wires,

a full sternal rewiring would be required.  If the sternum hurt less in the following three months,

surgery might be avoided.   Heiskell was again counseled to lose weight.  He said he planned to start after the holidays.  [Tr. at 249.]

On December 20, 2002, PA Elder wrote a letter addressed to whom it may concern on behalf of Heiskell.  [Tr. at 281.]  The letter states that surgery had been performed on Heiskell in January 2002, during which bypass grafting was performed.   Heiskell had been relatively stable post-operatively, but had noticed some discomfort in his chest incision beginning in March 2002.  In July 2002, Heiskell was seen at the VA and an x-ray revealed that one of six sternal wires holding his sternum together was broken.  An exam on August 22, 2002 confirmed instability in the lower section of Heiskell's sternum due to the broken wire.  The letter explains that Heiskell was not in eminent danger, but was told that he would have to curtail his active lifestyle if his sternum was to heal. Heiskell was advised not to lift over 10 pounds, to use his upper extremities equally and not to undertake prolonged physical activity.  He was told to lose 50 pounds.

The letter also detailed that Heiskell was again seen on December 18, 2002 for a follow up x-ray.  His symptoms were unchanged or worse.  His stamina was reduced, and he had difficulty sleeping.  Heiskell was unable to lose weight because he could not walk.  The letter by PA Elder further stated that Heiskell probably would need his entire sternum re-wired and that a cat scan was scheduled for March 13, 2003.  PA Elder requested Heiskell be given temporary disability from the time the wire fracture was brought to the VA's attention in July 2002 until final disposition in six months.  The PA predicted that Heiskell would need at least two months to recover if his entire sternum was re-wired.  [Tr. at 281.]

18

On December 30, 2002, Heiskell filled out his request for an ALJ hearing. He wrote that "they did not want all the information the doctors have been telling me. My sternum has not healed as it should have. My bottom wire is broke . . . ." [Tr. at 49.]

### *2003 Medical Records*

Heiskell was seen at the VA on February 20, 2003, regarding a possible repair of broken sternal wires. The record indicates that Heiskell was uncertain whether he wished to proceed with surgery for the repair. He would await the chest CT before making the decision. Heiskell denied chest pain or SOB. There were no clinical signs of congestive heart failure. His blood pressure was elevated without the use of medications, and Heiskell was encouraged to be compliant with his medications. He again was advised to stop the use of chewing tobacco. Heiskell refused a colonoscopy at this visit. [Tr. at 359.]

There is a radiology record related to Heiskell's CT scan, dated March 14, 2003. The scan revealed several median sternotomy wires were fractured in the lower sternum. Heiskell also complained of hip pain but the films of his bilateral hips were normal. [Tr. at 370.]

On May 29, 2003, Judge Cole held the ALJ hearing. The ALJ provided a clear explanation to Heiskell that he had a right to have an attorney at the hearing. Heiskell elected to proceed without any legal representation. [Tr. at 388.] Heiskell stated that he typically got up between 4:30 and 9 a.m. depending on his chest complaints, and that he went to bed by 11 or 12 p.m. [Tr. at 394.] He explained that his sternum was still "broken" which pinched his nerves and woke him at night. He explained he was given three options regarding re-wiring: (1) leave it to see if it might gradually heal; (2) remove the loose wire through surgery; or (3) re-do the entire wiring of his chest which would require opening up his sternum again. [Tr. at 395.] Heiskell did not appear to want to proceed with

19

the third option, but also felt it was the only option that would help him. Heiskell testified that the doctor said the third option entailed a high risk.

As of May 2003, Heiskell described his daily activities to consist of watching TV with his dish network. He used to love golf but could not swing his clubs now. He previously loved to hunt and fish but could not "get on the animals now" and could not run. His breastbone hurt. He still could fish but could not fly fish due to pain. [Tr. at 396.] Heiskell played with his pre-1900 weapons but could not shoot some of his guns because shooting them was too hard on his sternum. He had old buffalo guns that he still could shoot. He liked to make knives. [Tr. at 397.] He had an all terrain vehicle ("ATV"). He had tools but stated he could not really use them. [Tr. at 397.] Some of Heiskell's testimony regarding his activities follows:

> . . . I like to play with 3 (sic-pre) 1900 weapons. The old (inaudible) down under type, I like to make them shoot out to 1,000 yards. Some of my guns I can't shoot, but I've got these, the old Buffalo guns that I load down, I load them, I cast my own bullets and I load with my own powder. And I like to get them hitting out at 1,000 yards, that's about the only major hobby that I, that I [am] involved with right now. . . . .
>
> I like to make knives, that's another one of my hobbies. I haven't felt like doing that. I've got one started, I make them from scratch, cut them out of old sawmill blades.[13] You know, like I said, my background is carpentry and millwright work and I like working with my hands. I've got the tools, I just haven't felt like it, I just can't – my chest won't let me. . . .
>
> I got, I got a fifth wheel, sir, 37 foot fifth wheel. . . . Sir, I've got a cargo area in the back of that that I can put my ATV up there, and I've got a reloading bench out there that I reload all my stuff (inaudible) right now that I can do. . . .

---

[13]The making of knives as described by Heiskell sounds like possibly heavy exertion work involving the use of heavy equipment. Heiskell initially testified that he could not use his tools, but he had started making a knife. In addition, near the end of the ALJ hearing, Heiskell offered to make the ALJ a knife. [Tr. at 412.]

> That's all in the back, I still got my drill press up front, I haven't used
> it.  I've got a tool box back there, I've got two (inaudible) doors back
> there and I got a half freezer back there.  The back ends fold down,
> those types of RV's.  Most of them are just called a sport, it's a wild
> wood sport, a 37 footer . . . .

[Tr. at 396-98.]  Heiskell's description of activities, i.e., camping, loading and unloading his ATV,

climbing onto the truck bed for use of his reloading bench, retrieving tools from the truck bed, sports

shooting, fishing, use of an ATV, handling a 37-foot RV on logging roads, simply is inconsistent with

a picture of a man who is unable to work due to disabilities.

Heiskell testified that he could not return to his previous work as a construction manager

because he could not climb stairs or "cover ground."  He did not have the (educational) degrees that

he believed were necessary to attain work in an office.  He testified that he had never filed for social

security benefits before May 17, 2002 (although that testimony is untrue).  [Tr. at 402.]

Heiskell also testified that he "ate like a bird" but could not lose weight and could not

exercise.  He was able to drive a truck and get into a campsite, but he could not walk any distance

to hunt.  He did, however, use a bow for hunting when he could.  He was able to drive through a

logging road, but was unable to use his large bow.  [Tr. at 404.]  Heiskell testified that he had gone

hunting one time since the bypass surgery.  He claimed that pain related to the lack of fusion in his

ribcage prevented him from working, rather than problems with his heart.  [Tr. at 404-05.]  He

argued that he had worked 40 years and the VA had given him disability benefits without needing

additional verification or evidence from Heiskell.  In response, Judge Cole informed Heiskell that the

VA uses different standards than the SSA in awarding disability benefits.  [Tr. at 406.]

Heiskell's cousin, Mickey Smith, testified at the hearing on behalf of Heiskell.  He stated that

Heiskell could not stand or walk long, that he complained his hips hurt, that he could fish but only

in close proximity to where they parked the truck.  Any hunting had to be undertaken from the truck. [Tr. at 410.]

The Vocational Expert also testified at the hearing.  [Tr. at 413.]  At the end of the VE's testimony, the ALJ asked the VE to write a letter setting forth additional light and sedentary level jobs in which Heiskell could use his transferable skills.  The ALJ explained to Heiskell that the SSA would send this letter to Heiskell so that Heiskell could annotate it with any and all explanations regarding why he might not be able to perform the listed jobs.  [Tr. at 417.]  Heiskell asked at the end of the hearing whether he should get an attorney "the next time," and the ALJ responded that it was Heiskell's decision.  [Tr. at 418.]

On June 3, 2003, VE Bowman wrote to the ALJ, listing the additional jobs that Heiskell could perform "within your hypo question."  Those positions were: procurement clerk (sedentary); estimator (sedentary); building supply retail sales (light); shipping/receiving clerk (light); and material clerk (light).  On July 21, 2003, the SSA sent a copy of the VE's letter to Heiskell and informed Heiskell that he could submit a written response, submit additional evidence and/or request a supplemental hearing.  Heiskell did not respond in any way to the letter.  [Tr. at 151.]

On October 1, 2003, Judge Cole issued an adverse decision denying Heiskell's DIB application.  On October 27, 2003, when Heiskell submitted a request for review of the ALJ's decision, he was represented for the first time by counsel.  [Tr. at 14.]

There is one last medical record, dated November 7, 2003, that the appeals council reviewed, but that was not before the ALJ.[14]  Heiskell visited the VA on November 7th.  The record discusses

---

[14]The ALJ also did not review the VA's explanation of benefits letter, dated May 2002, but that letter was provided to the Appeals Council.

Heiskell's medical history and problems related to the sternal wire that was causing him pain on movement, coughing or sneezing.  Heiskell was limited in his physical activities because of pain.  The record notes that the VA recommended a repair of the sternum with re-wiring.  [Tr. at 385.]

On July 19, 2004, the appeals council rejected Heiskell's request for review.

### Discussion

ALJ Cole thoroughly and comprehensively examined the medical records in this case.  [Tr. at 23-27.]  Moreover, the ALJ properly found Heiskell's testimony about his restrictions to be partially credible.  Heiskell's credibility regarding his restrictions and alleged disabilities is significantly undermined by his unflagging resolve to engage in activities requiring heavy exertion shortly after suffering a heart attack.

For example, it defies logic to believe that Heiskell is disabled by his cardiac artery disease and history of myocardial infarction, when, a month or two after heart surgery, he is engaged in big game hunting (which involves significant walking through mountainous terrain, crouching or laying down to position oneself for a shot, carrying a firearm or bow, ammunition or arrows, and heavy outdoor gear, and packing out hundreds of pounds of game if the hunt was successful).  It is equally difficult to believe that Heiskell considered himself unable to work when he refused a physician-recommended physical exercise program and a stress test in order to pursue those same recreational interests that involve significant physical strain.  This is all the more true under circumstances where Heiskell weighed 200-250 pounds, never seemed to get around to trying to lose weight, continued to use "snuff" against repeated medical advice, suffered at times from very high blood pressure and was not compliant in taking prescribed medications.  Heiskell's decisions to continue engaging in

23

those activities under such circumstances and when he knew of his heart condition, are clear evidence that Heiskell himself did not believe he had disabling medical conditions or restrictions.

In sum, the Court concludes that substantial evidence supports the ALJ's credibility findings. Moreover, the Court finds that the ALJ properly considered Heiskell's activities and his failure to follow the advice of his physicians in reaching those credibility determinations.

Notwithstanding these findings, the Court will remand this case for re-hearing before an Administrative Law Judge.  The Court is troubled by the ALJ's  failure to clearly specify the RFC findings he reached and accordingly, to provide a precise hypothetical to the VE.  "Testimony elicited by hypothetical questions that do not relate with precision all of a claimant's impairments cannot constitute substantial evidence to support the Secretary's decision."  Hargis v. Sullivan, 945 F.2d 1482, 1492 (10th Cir. 1991) (internal citation omitted).

> A vocational expert's testimony may provide a proper basis for an ALJ's determination at step five only when a claimant's impairments are adequately reflected in the hypotheticals posed to the expert.  An ALJ is required to accept and to include in his hypothetical questions limitations supported by the record.
>
> Furthermore, if an ALJ finds that a claimant cannot perform the full range of work in a particular exertional category, an ALJ's description of his findings in his hypothetical and in his written decision must be particularly precise.  For example, according to one of the agency's own rulings on sedentary labor, the description of an RFC in cases in which a claimant can perform less than the full range of work 'must be specific as to the frequency of the individual's need to alternate sitting and standing.' . . . Next, an ALJ must consider how the age of a claimant over fifty, along with his severe impairment, might seriously affect his ability to adjust to other work.  Courts have generally recognized that the agency 'faces a more stringent burden when denying disability benefits to older claimants.'

Vail v. Barnhart, 84 Fed. Appx. 1, 4-5 (10th Cir. Nov. 26, 2003) (internal citations to case law and regulations omitted).

At step five of the sequential process, the Commissioner carries the burden of demonstrating that Heiskell is capable of performing other work.  The Commissioner may satisfy that burden through the proper use of a VE's testimony.  In Vail, the Tenth Circuit concluded that the ALJ did not support his decision with substantial evidence because the ALJ's hypothetical questions to the VE lacked key information and because "the ALJ's use of the VE's testimony in his final decision suffered from important gaps in analysis that do not permit us to review his reasoning."  Id. at 5 (internal citation omitted).  Thus, the Court reversed because it could not draw conclusions on the ALJ's behalf.  Id.

Here, the ALJ listened to testimony by Heiskell and then Heiskell's cousin before questioning the VE.  He asked the VE if she had reviewed the vocational documents in the file and listened to the claimant's testimony about his past relevant work.  [Tr. at 413.]  The VE then gave the ALJ a vocational profile of Heiskell's past relevant work, which involved lifting as much as 100 pounds. [Tr. at 413.]  The ALJ asked if Heiskell had transferable skills, to which the VE responded by listing a number of such skills.

At this point, the ALJ asked the VE to "list those jobs at the light and sedentary level that would use these transferable skills".  [Tr. at 414.]  The VE listed three positions Heiskell could do that were classified as "light" jobs.  She listed several positions that were "sedentary" that Heiskell could perform.  [Tr. at 415.]  The ALJ then asked the VE to submit a letter later listing the various jobs at light and sedentary levels in which Heiskell could use his transferable skills.  [Tr. at 417.]

Noticeably lacking from the ALJ's questions of the VE was a hypothetical question that actually included a full description of Heiskell's impairments.  Indeed, the ALJ did not set forth any limitations or restrictions in his questions to the VE, nor did he specify to the VE that he found

25

Heiskell could not perform the full range of light work during certain portions of the relevant time frame (as he did in his written decision). "Hypothetical questions must include a full description of a claimant's impairments in order for the testimony elicited by such questions to constitute substantial evidence to support the ALJ's decision." Gann v. Barnhart, 2004 WL 2282910 at *4 (D. Kan. 2004) (relying on Hargis, 945 F.2d at 1492).

It is true that a hypothetical need not include impairments that the ALJ did not accept as true, see Evans v. Chater, 55 F.3d 530, 532 (10th Cir. 1995), but here, it is not clear what limitations or impairments the ALJ determined Heiskell had or did not have with respect to formulating questions for the VE. Nor is it clear what the VE might have assumed as the basis for her testimony describing work Heiskell could perform. The ALJ did not discuss any findings at the hearing regarding Heiskell's ability to perform light or sedentary work, or a limited range of light work. Consequently, no such limitations were described to the VE.

The Court concludes that the VE's testimony does not constitute substantial evidence in support of the ALJ's finding of non-disability. That is true because the ALJ did not provide a proper hypothetical question to the VE and did not specifically describe the frequency of Heiskell's limitations as the ALJ must when he determines that a claimant can perform less than a full range of work.[15] Moreover, the Court also reaches this conclusion because the agency "faces a more stringent burden when denying disability benefits to older claimants." The Court determines that the agency failed to meet that higher burden in this case.

_____

[15]The Commissioner's argument in the agency's opposition brief that "[i]t is reasonable to infer, based on the ALJ's discussion, that he found Plaintiff capable of performing all of the regulatory requirements of sedentary work and some of the regulatory requirements of light work" is unpersuasive. The Agency bears the burden at step five of the sequential process, and the use of inferences is insufficient to satisfy that burden.

Upon remand, the ALJ should conduct a re-hearing with a vocational expert in attendance. The ALJ should assess Heiskell's RFC, making specific function-by-function findings at step four of the sequential process so that he or she can adequately describe Heiskell's impairments in a hypothetical to the VE. Such analysis will require a thorough review of the administrative record and discussion of the pertinent evidence. If the ALJ again determines that Heiskell cannot perform a full range of work in a particular exertional category, the ALJ should provide specific details as to Heiskell's limitations. Moreover, because Heiskell is claimant over fifty years of age, the ALJ must consider how his age might seriously affect his ability to adjust to other work during the pertinent time frame.

IT IS THEREFORE ORDERED that Heiskell's Motion to Reverse and Remand for a Rehearing [Doc. No. 11] is GRANTED and this matter is remanded for a rehearing so that the ALJ can address the issues described herein.

_____
Lorenzo F. Garcia
Chief United States Magistrate Judge